**CRIMINAL MINUTES – GENERAL**                    **'O'**

| Case No. | 2:19-CR-00490-CAS-1 | | Date | May 20, 2021 |
|---|---|---|---|---|
| Present: The Honorable | CHRISTINA A. SNYDER | | | |
| Interpreter | N/A | | | |

| Catherine Jeang | Not Present | Andrew Roach, Not Present<br>Ali Moghaddas, Not Present |
|---|---|---|
| *Deputy Clerk* | *Court Reporter/Recorder, Tape No.* | *Assistant U.S. Attorney* |

| U.S.A. v. Defendant(s): | Present | Cust. | Bond | Attorneys for Defendants: | Present | App. | Ret. |
|---|---|---|---|---|---|---|---|
| PAUL FRANCISCO TORRES, III | NOT | X | | CHARLES SNYDER | NOT | X | |
| | | | | JENNIFER UYEDA | NOT | X | |

**Proceedings:**     [REDACTED] - (IN CHAMBERS) RENEWED MOTION TO SUPPRESS OR, IN THE ALTERANTIVE, MOTION FOR RECONSIDERATION OF ORDER DENYING MOTION TO SUPPRESS (Dkt. 149, filed on April 19, 2021)

MOTION IN LIMINE TO EXCLUDE DRUG EXPERT TESTIMONY AND REQUEST FOR DAUBERT HEARING (Dkt. 151, filed on April 19, 2021)

MOTION TO DISMISS FOR SPEEDY TRIAL VIOLATIONS (Dkt. 152, filed on April 19, 2021)

## I.     INTRODUCTION AND BACKGROUND

Defendant Paul F. Torres III was indicted on August 23, 2019, on two criminal counts: (1) possession with intent to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(viii); and (2) felon in possession of ammunition in violation of 18 U.S.C. § 922(g)(1). Dkt. 4 ("Indictment"). The government charges that, following a June 7, 2019 traffic stop and search of a vehicle in which defendant was a passenger, the Oxnard Police Department ("OPD") found two .223 rifle ammunition rounds, a methamphetamine pipe, and a backpack containing plastic baggies and 45.73 grams of suspected methamphetamine (the "contraband") belonging to defendant. Dkt. 1 ("Compl.") ¶¶ 7–9; Indictment at 1. Because the facts of the case are well-known to the parties, the Court sets forth below only those necessary to rule on the instant motions.

Now before the Court are three motions filed by defendant on April 19, 2021: a motion to dismiss, dkt. 152 ("MTD"), a renewed motion to suppress, dkt. 149 ("Mot. to Suppress"), and a

motion *in limine* to exclude expert testimony, dkt. 151 ("MIL").[1]  The government opposed each on May 3, 2021.  Dkts. 157 ("Opp. to MTD"), 159 ("Opp. to Mot. to Suppress"), 160 ("Opp. to MIL").  On May 7, 2021, the government supplemented its opposition to defendant's motion *in limine*.  Dkt. 165 ("Supp. Opp. to MIL").  Defendant replied on May 10, 2021.  Dkts. 166 ("Reply ISO MTD"), 167 ("Reply ISO Mot. to Suppress").  Finally, on May 12, 2021, defendant filed a supplement to his motion *in limine*.  Dkt. 168 ("Supp. to MIL").  The Court heard oral argument on May 17, 2021.

Having carefully considered the parties' arguments and submissions, the Court finds and concludes as follows.

## II.    MOTION TO DISMISS

Defendant moves to dismiss the indictment pursuant to the Speedy Trial Act and the Sixth Amendment's Speedy Trial Clause.

### A. Background

Defendant was arrested on August 26, 2019, at which point he made his initial appearance. Dkts. 9 (report commencing criminal action), 10 (calendar/proceedings sheet).  He has been detained pending trial, which was initially set for October 22, 2019.  Dkt. 15 (criminal minutes). The parties stipulated to continue the trial date initially to February 11, 2020, and then to April 7, 2020, due to scheduling conflicts.  Dkts. 18, 21.  The time from October 22, 2019, to April 7, 2020, was found to be excludable time pursuant to 18 U.S.C. § 3161(h)(7), the "ends of justice" provision of the Speedy Trial Act.  Dkts. 19, 22.

The COVID-19 pandemic and the related court closures resulted in significant additional delay in holding defendant's trial.  On March 13, 2020, the Chief Judge of the Central District of California issued the first of several general orders which together will have suspended jury trials in the Western Division of the District from March 13, 2020, through June 7, 2021.  See C.D. Cal. General Order 20-02 (March 17, 2020); C.D. Cal. General Order 20-05 (April 13, 2020); C.D. Cal. Amended General Order 20-08 (May 28, 2020); C.D. Cal. General Order 20-09 (August

---

[1] Defendant filed two substantively identical motions to suppress.  Dkts. 147, 149.  The second filing, entitled "Corrected Notice of Motion and Motion to Suppress," includes tables of contents and authorities, which were apparently omitted from the original filing.  See dkt. 149. The Court refers to this filing throughout its order.

6, 2020); C.D. Cal. General Order 21-03 (March 19, 2021); C.D. Cal. General Order 21-07 (April 15, 2021).  (This Court sits in the Western Division, located in Los Angeles, California.)

The general orders were entered upon unanimous or majority votes of the district judges of the Central District with the stated purpose "to protect public health" and "to reduce the size of public gatherings and reduce unnecessary travel," consistent with the recommendations of public health authorities.  C.D. Cal. General Order 20-02 at 1; C.D. Cal. General Order 20-05 at 1; C.D. Cal. Amended General Order 20-08 at 1; C.D. Cal. General Order 20-09 at 1; see Blueprint for a Safer Economy, https://covid19.ca.gov/safer-economy/.

The general orders have resulted in six continuances of defendant's trial.  Defendant did not oppose the first two of these continuances, which the Court granted on March 20, 2020, dkt. 43, and April 27, 2020, dkt. 50.  These two combined to continue defendant's trial from April 7, 2020, to July 7, 2020.  The Court found this time excludable pursuant to the ends of justice provision of the Speedy Trial Act.  Dkts. 43, 50.

However, defendant opposed the next four continuances, which the government sought *ex parte* on June 3, 2020, dkt. 51, August 14, 2020, dkt. 92, October 20, 2020, dkt. 119, and January 21, 2021, dkt. 142.  The Court granted each.  Dkts. 55, 95, 121, 144.  The Court noted that it could not summon jurors into the courthouse to hold a trial, pursuant to the general orders of the Court and precautions to prevent the spread of COVID-19.  See, e.g., dkt. 112 (transcript of hearing) at 4:22–5:2, 17:16–20:3.  These four continuances combined to continue defendant's trial from July 7, 2020, to May 25, 2021.  Dkts. 55, 95, 121, 144.  The Court found this time excludable pursuant to the ends of justice provision of the Speedy Trial Act.  Dkts. 55 at 7, 95 at 13, 121 at 9, 144 at 9.

As noted above, the first week for jury trials in the Western Division is the week of June 7, 2021.  C.D. Cal. General Order 21-07 at 2.  In the Western Division, the first jury summonses were issued April 19, 2021.  See id.  The Chief Judge has ordered that defendant's trial take place that week, on June 10, 2021.[2]  Defendant now moves to dismiss on the grounds that the ends of justice exclusions have been improper, and that the Speedy Trial Act therefore requires dismissal.

---

[2] The delay between June 7, 2021, and June 10, 2021, is occasioned by the fact that there is only one courtroom in the Western Division appropriate for empaneling criminal juries, and there are multiple similarly situated defendants whose trials must be scheduled.

## B. Legal Standard

In order to give effect to the Sixth Amendment "right to a speedy and public trial," U.S. Const. amend. VI., Congress enacted the Speedy Trial Act, Pub. L. No. 93-619, 88 Stat. 2076 (1975); see United States v. Olsen, --- F.3d ----, No. 20-50329, 2021 WL 1589359, at *1 (9th Cir. Apr. 23, 2021) ("Olsen") (citing Furlow v. United States, 644 F.2d 764, 768–69 (9th Cir. 1981) (per curiam)). The Speedy Trial Act imposes several time limits after arraignment or indictment within which criminal trials must commence. Olsen, 2021 WL 1589359, at *1.

Relevant here is the requirement, pursuant to 18 U.S.C. § 3161 ("Section 3161"), that a criminal trial begin within 70 days from the date on which the indictment was filed, or the date on which the defendant makes an initial appearance, whichever occurs later. 18 U.S.C. § 3161(c)(1). If trial does not begin within the requisite time period and the defendant moves for dismissal prior to trial, the court must dismiss the indictment. 18 U.S.C. § 3162(a)(2).

The Speedy Trial Act, however, affords courts some flexibility by enumerating eight types of delays which constitute "excludable time"—time which does not count toward the 70-day limit. See 18 U.S.C. § 3161(h). At issue here is the ends of justice provision, which permits the exclusion of time where a district court finds "that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial." 18 U.S.C. § 3161(h)(7)(A). Section 3161(h)(7)(B) requires that courts, in determining whether the ends of justice outweigh the best interest of the public and the defendant in a speedy trial, must evaluate, "among others," several enumerated factors. See 18 U.S.C. § 3161(h)(7)(B)(i)–(iv). The only factor relevant here is "[w]hether the failure to grant such a continuance in the proceeding would be likely to make a continuation of such proceeding impossible, or result in a miscarriage of justice."[3] 18 U.S.C. § 3161(h)(7)(B)(i). Finally, the Ninth Circuit "requires that a continuance granted under the 'ends of justice' exception include a specific period of time and be based upon specific factual circumstances justified in the record[.]" United States v. Paschall, 988 F.2d 972, 974–75 (9th Cir. 1993) (citation omitted); see United States v. Lewis, 611 F.3d 1172, 1176 (9th Cir. 2010).

---

[3] The other factors apply when (1) the case is "so unusual or complex" that trial preparation could not be completed within the limits set by Section 3161, (2) arrest precedes indictment, or (3) either party's counsel needs more time to prepare for trial despite due diligence. 18 U.S.C. § 3161(h)(7)(B)(ii)–(iv).

## C. Discussion

### 1. Speedy Trial Act

Defendant argues that the Court's decision to exclude the time between July 7, 2020, and May 25, 2021, "was not supported by either the record or the law." MTD at 18. First, defendant argues that California's public-health orders to which the Court deferred did not prohibit jury trials, as evidenced by the fact that state-court jury trials were proceeding. Id. According to defendant, "[i]f a trial can go forward on the scheduled date (accommodating any difficulties presented by the event), proceeding with the case is neither impossible nor a miscarriage of justice under any normal meaning of those terms[.]" Id. at 17.

Second, defendant argues that the continuances granted by the Court, while technically time limited, were arbitrary and unrelated to the circumstances of the pandemic. Id. at 19. Defendant notes, for instance, that the Court granted a continuance from September 8, 2020, to November 10, 2020, without stating "why the conditions justifying the continuance would have ended by November 10[.]" Id. As it turned out, pandemic conditions were "mild" during that time. Id. Additionally, the Court granted a continuance and excluded the time from February 16, 2021, to May 25, 2021, during which time the State, county and city allowed indoor dining, and attendance at theaters, gyms, churches and bars. Id. at 19–20.

Finally, defendant argues that the "impossibility" of holding jury trials is less a function of the pandemic than it is a result of the Central District's failure to implement any mitigation measures. Id. at 20. As defendant puts it, "the Court and government's self-created barriers, over which the accused have no control, are not valid reasons for excluding time. The Court's refusal to adapt like the rest of society—including nearby state courts and the federal grand jury—is not a legally-valid justification." Id.

The government responds that the general orders were based on national, state and local public health guidance, including Centers for Disease Control and Prevention ("CDC") recommendations for reducing the spread of the virus. Opp. to MTD at 4. Furthermore, the government argues that "[t]here has been no Speedy Trial Act violation because the Court has made explicit findings in each of its trial continuance orders excluding the time periods between April 7, 2020 (the trial date defendant previously requested) and May 25, 2021 (the current trial date)[.]" id. at 8. (The trial date was set for May 25, 2021, at the time of defendant's filing.)

The Ninth Circuit recently addressed similar arguments in Olsen. A judge of this Court dismissed the government's indictment in Olsen because, due to the Court's general orders, a trial could not be held within the 70-day limit imposed by Section 3161(c). The judge rejected the government's argument that the ends of justice provision should apply in the context of the COVID-19 pandemic on the grounds that "[c]ontinuances under the 'ends of justice' exception

in the Speedy Trial Act are appropriate if without a continuance, holding the trial would be *impossible*," reasoning that "*actual impossibility* is key for application of [the ends of justice] exception." United States v. Olsen, 494 F. Supp. 3d 722, 727, 728 n.4 (C.D. Cal. 2020) (emphasis in original), rev'd and remanded, No. 20-50329, 2021 WL 1589359 (9th Cir. Apr. 23, 2021).

The Ninth Circuit rejected this reading of Section 3161(h)(7), holding instead that the ends of justice provision permits a continuance even when conducting a trial is not "impossible." Olsen, 2021 WL 1589359, at *6. In reaching this conclusion, the Ninth Circuit faced the arguments that State court trials had been proceeding, and that California's COVID-19 guidelines permitted some businesses to operate. But the Olsen court found these observations unpersuasive because, as noted above, the ends of justice provision does not require actual impossibility, and, furthermore, the record was insufficient to support a meaningful comparison of the safety risks involved in conducting a jury trial as opposed to operating a business, or even of the risks involved in conducting a jury trial in one courthouse as opposed to another. Id. at *4, *7 n.9. And the Olsen court addressed the general orders themselves, concluding:

> The Central District of California did not cast aside the Sixth Amendment when it entered its emergency orders suspending jury trials based on unprecedented public health and safety concerns. To the contrary, the orders make clear that the decision to pause jury trials and exclude time under the Speedy Trial Act was not made lightly. The orders acknowledge the importance of the right to a speedy and public trial both to criminal defendants and the broader public, and conclude that, considering the continued public health and safety issues posed by COVID-19, proceeding with such trials would risk the health and safety of those involved, including prospective jurors, defendants, attorneys, and court personnel.

Id. at *9.

Olsen forecloses defendant's arguments here. To the extent defendant argues that time should not have been excluded under the ends of justice provision because it was technically possible to hold a trial, the argument fails because actual impossibility is not required under that provision. Furthermore, the fact that businesses were open and that other courthouses held trials does not establish that the ends of justice were not served by continuing defendant's trial under the circumstances, nor does it establish that the general orders were arbitrary, unreasonable or unjust. In fact, the Ninth Circuit has already upheld the propriety of the general orders.[4]

---

[4] In his reply, defendant argues that, to the extent the Court will rely on the general orders, defendant should be entitled to "an evidentiary hearing on whether (despite the ban) a reasonably

Olsen also explicitly embraced a balancing test considering "whether the ends of justice served by granting a continuance outweigh the best interest of the public and the defendant in convening a speedy trial." Id. at *7. To facilitate application of this test, the Olsen court provided a non-exhaustive list of factors relevant to continuances related to a pandemic:

> (1) whether a defendant is detained pending trial; (2) how long a defendant has been detained; (3) whether a defendant has invoked speedy trial rights since the case's inception; (4) whether a defendant, if detained, belongs to a population that is particularly susceptible to complications if infected with the virus; (5) the seriousness of the charges a defendant faces, and in particular whether the defendant is accused of violent crimes; (6) whether there is a reason to suspect recidivism if the charges against the defendant are dismissed; and (7) whether the district court has the ability to safely conduct a trial.

Id. at *7.

Here, several factors weigh in favor of excluding time. First, defendant does not appear to be a member of a high-risk population. Further, the crime for which he has been charged is serious, although non-violent. Based on his criminal history, there appears to be a risk of recidivism. Defendant disputes this, urging the Court to read the sixth Olsen factor as requiring a risk of recidivism *for the charged offenses*. Reply ISO MTD at 6. But even if the Court were to adopt defendant's narrow reading of this factor, defendant has prior convictions for possession of a controlled substance and possession of marijuana with intent to distribute, among others, which suggest a risk of recidivism with respect to the crime of possession with intent to distribute charged in this case. Compl. ¶ 24. Finally, the Court found it would have been unsafe to hold a trial for the reasons discussed above.

On the other hand, several factors weigh against finding that the ends of justice outweigh the interest of the defendant: most significantly, the fact that defendant has been detained before trial and that this detention has been prolonged. See Reply ISO MTD at 3–4. And while defendant has not argued for dismissal based on Section 3161(c), he has asserted his Speedy Trial Act rights pursuant to Section 3164 and in his objections to trial continuances.

---

safe trial could have happened last summer or afterwards." Reply ISO MTD at 7. The Court declines this request. The Ninth Circuit has approved the general orders, and, in any event, there is no reason to believe an evidentiary hearing would be of any assistance to the Court's consideration of defendant's motion.

But the Ninth Circuit has already ruled on the propriety of defendant's pre-trial detention in light of his Speedy Trial Act rights.  In <u>United States v. Torres</u>, --- F.3d ----, No. 21-50006, 2021 WL 1589361 (9th Cir. Apr. 23, 2021), the Ninth Circuit affirmed this Court's order denying defendant's motion for release from pretrial detention, and in so doing held that "the district court's orders continuing Torres's trial date under 18 U.S.C. § 3161(h)(7) necessarily accounted for his pretrial detention." <u>Id.</u> at *9.  The Ninth Circuit, then, apparently found no error in this Court's imposing continued pretrial detention, so long as the case was brought to trial at the soonest time practicable.  <u>See id.</u> at *11.  Defendant argues that the Court should reject the notion that the Ninth Circuit in <u>Torres</u> implicitly endorsed this Court's ends of justice continuances. Reply ISO MTD at 3.  However, the Ninth Circuit approved defendant's continued detention under the circumstances in light of his argument that there was a violation of the Speedy Trial Act.  Thus, the time excluded pursuant to the ends of justice provision was properly excluded, and defendant's 70-day trial clock has not expired.[5]

### 2. Sixth Amendment Speedy Trial Clause

Defendant moves, in the alternative, for dismissal on the ground that the delay in his trial violates the Sixth Amendment's Speedy Trial Clause.  MTD at 24.  The Sixth Amendment guarantees that, "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial."  U.S. Const. amend. VI.  Because the Speedy Trial Act was implemented to give force to this clause, "it will be an unusual case in which the time limits of the Speedy Trial Act have been met but the Sixth Amendment right to speedy trial has been violated." <u>United States v. Nance</u>, 666 F.2d 353, 360 (9th Cir. 1982); <u>see United States v. Baker</u>, 63 F.3d 1478, 1497 (9th Cir. 1995) ("[T]he Speedy Trial Act affords greater protection to a defendant's right to a speedy trial than is guaranteed by the Sixth Amendment, and therefore a trial which complies with the Act raises a strong presumption of compliance with the Constitution.").

Although defendant did not raise this Sixth Amendment argument in his previous motion for bail, he did argue that the Due Process Clause required his release.  <u>See</u> dkt. 122.  In ruling on

---

[5] In footnotes, defendant argues that the seven-week delay between the date on which the Central District issued its first jury summons and the date of trial cannot be excluded because the District could have preemptively issued summonses in anticipation of an imminent re-opening, MTD at 20 n.10; and that the general orders were "almost certainly" *ultra vires* or an invalid exercise of administrative authority, <u>id.</u> at 20 n.11.  These arguments are unpersuasive because, as discussed above, the Ninth Circuit has approved of the general orders, and the timing of jury summonses was established in those orders.  In any event, defendant cites to no authority to support this argument.

that motion, the Court found that defendant's prolonged detention did not yet violate the Due Process Clause, and, on appeal, the Ninth Circuit upheld this Court's ruling, although it cautioned that the Court should revisit its conclusion if defendant were not tried by May 25, 2021. <u>Torres</u>, 2021 WL 1589361, at *11. The Ninth Circuit's ruling on defendant's due process rights is instructive for this Court's analysis of defendant's Sixth Amendment argument. Although the analyses under the Due Process Clause and the Speedy Trial Clause are not identical, they do overlap significantly. <u>See</u> <u>Barker v. Wingo</u>, 407 U.S. 514, 530 (1972) (under Sixth Amendment right to speedy trial, courts must consider (1) length of delay, (2) reason for delay, (3) defendant's assertion of speedy trial right; and (4) prejudice to defendant). Thus, in light of its finding that the Speedy Trial Act has not been violated, the Ninth Circuit's finding that the Due Process Clause has not been violated, and consideration of the factors enumerated in <u>Barker</u>, 407 U.S. 514, the Court finds that the COVID-19–related delays in defendant's trial have not violated his Sixth Amendment right to a speedy trial.

Accordingly, the Court **DENIES** defendant's motion to dismiss.

## III.   MOTION TO SUPPRESS

Defendant moves to suppress all evidence obtained after the traffic stop on the grounds that the stop itself violated the Fourth Amendment.

### A. Background

1. <u>The Traffic Stop</u>

At approximately 7:55 PM on the evening of June 7, 2019, OPD Officers Jared Schmelter and Cody Collet, while on patrol,



Immediately thereafter, the officers contacted OPD dispatch. <u>See</u> dkt. 25-1, Declaration of Charles Snyder ("Snyder Decl. 1"), Exh. 2 (recording). In a recorded call, the officers reported the Hyundai's license plate, their car number, and their

location.  Id.  The officers did not mention defendant, did not mention a felony arrest warrant, and did not request backup on the recorded call.  Id.  However, according to the officers, ██████ ██████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████ Collet asked the driver and passengers for their identification.  Snyder Decl. 1, Exh. 3 (body camera video) at 0:55–1:06, 1:18–2:48.  Defendant gave the name "Robert Ramirez" and a birthdate of September 27, 1984, but said he did not have identification.  One officer then stated to defendant, "are you sure?"  In their testimony, ██████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████ When the officers finished reviewing the information on their phones, Schmelter asked defendant—stating, somewhat incredulously, "Mr. Ramirez, was it?"—whether he was on probation.  Defendant replied that he had been, but was not any longer.  At that point, and after confirming whether defendant had any weapons, Schmelter ordered defendant to exit the car.  See generally Snyder Decl. 1, Exh. 5 (body camera video) at 2:20–6:00.

Collet announced to the other two passengers that he was "going to do a probation search for Mr. Torres"—this statement by Collet was the first time anyone on the scene had mentioned defendant's true name.  See Snyder Decl. 1, Exh. 3 at 5:35–5:45.  Upon conducting a search of the car, the officers recovered the contraband.

      2.   Schmelter's Testimony Regarding His Awareness of Defendant's Warrant

On June 7, 2019—the day of the traffic stop—Schmelter prepared a post-arrest report in which he stated he knew defendant "from prior contacts and I have arrested him in the past.  I have also had numerous conversations with Torres from contacting him in the past.  I knew Torres was a Post Release Offender, had search terms, and also had an outstanding felony warrant."  Snyder Decl. 1, Exh. 1 (post-arrest police report) at 3.

On February 10, 2020—seven months after the traffic stop—██████████████████ ████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████



Defendant contends that, when Schmelter gave this interview, he had been put on notice that defendant planned to file a motion to suppress, which he did on February 18, 2020.  Mot. to Suppress at 3.

On March 2, 2020, Schmelter submitted a declaration in support of the government's opposition to defendant's motion.  Schmelter Decl.  In that declaration, Schmelter explained how he knew defendant was subject to a warrant:

The Court held a suppression hearing on July 23, 2020, at which Schmelter testified.  On direct examination, Schmelter stated that he wanted to supplement the declaration he had submitted.  Dkt. 89, transcript of July 23, 2020 hearing ("Tr."), at 9:23–25.  Relevant to how Schmelter knew defendant had an outstanding warrant, Schmelter testified for the first time that (1) he checked the status of defendant's warrant daily after being reminded of defendant by briefing related to a surveillance operation, and (2) he checked the status of defendant's warrant prior to going out on patrol the day of the arrest.  The relevant testimony is as follows:

> Q. And is there anything else, Officer Schmelter, that you would like to supplement your declaration with?
>
> A. Yes.
>
> Q. What is that?
>
> A. I recall the surveillance operation, uh, which brought my attention to the defendant and several other gang members in the city of Oxnard which lead [sic] me to check upon the defendants's [sic] status daily a couple weeks prior to the June 7th traffic stop.

Q. And what was the approximate timing of that law enforcement surveillance that you were doing?

A. It was the month prior.

Q. And that's what caused you to begin checking on a daily basis?

A. Correct.

Q. And what would you do when you would check on the defendant?

A. I would speak with, uh, investigators that were, uh, looking into the matter, and I would check on our law enforcement databases as well as checking through dispatch.

Q. And what do the databases tell you?

A. That the defendant had an outstanding warrant and was on probation.

Q. So when do you recall the last time checking the defendant's status before you went out on patrol on June 7th, 2019?

A. Prior to going out that day on June 7th.

Q. That day.

A. Correct.

Tr. at 10:20–11:23.

On cross-examination, Schmelter was asked to list all the means he may have used to inquire into the status of defendant's warrant.

Q. So Officer Schmelter, can you just tell us every single thing that you did, all the database [sic] that you looked at, everything you did in the months before, but any type of query that you sent?

A. I don't recall all the methods I did, but I can tell you what methods we have available.

Q. Okay, go ahead.

…

A. So for one instance, uh, I can reach out to a detective that is working with a probation officer. For instance if it's a probation warrant, the detective can let us know if the defendant checked in or not or if the warrant's still active.

…

A. Another method is reaching out to the probation officer specifically. There's [sic] people on our units that talk to the probation officers regularly. I'm not one of those.

Q. And what else?

A. Uh, you can then use the iCop system I was telling you about. You can also run them on the MDC.[6] You can call dispatch via the radio. You can call dispatch calling in on the telephone.

Q. And you can also use your hand-held device, too; right?

A. Yes.

Q. And did you—are there any other methods that you say that you used?

A. I don't recall any other methods.

Id. at 36:16–38:2. In sum, Schmelter testified that he inquired into defendant's status, and may have used the following methods to do so: (1) speaking with a detective working with a probation officer, (2) speaking with a probation officer directly, (3) using iCop, (4) using the MDC system, or (5) contacting dispatch.

      3.  <u>Factual Dispute Regarding Electronic Database Searches</u>

At the hearing, defendant challenged Schmelter's testimony by referring to records from an electronic database. By way of background, there are three databases from which information about defendant's warrant may have been queried: the Ventura County Criminal Justice Information System ("VCCJIS"), which is a county-run database of criminal justice records; the California Law Enforcement Telecommunications System ("CLETS"), which is a message routing system that connects to multiple State-run databases; and iCop, which is a mobile

---

[6] iCop is an application installed on officers' phones. A mobile digital communicator ("MDC") is a computer installed in police vehicles.

**CRIMINAL MINUTES – GENERAL**              'O'

application that only queries VCCJIS.[7] See dkt. 147-1, Declaration of Charles Snyder ("Snyder Decl. 2"), Exhs. 1–3.

On Schmelter's cross-examination, defendant introduced evidence showing that Schmelter had not queried about defendant on CLETS on the day of the arrest, nor daily in the weeks preceding the arrest. Tr. at 31:13–35:25. However, defendant did not offer evidence that Schmelter's queries of electronic databases would necessarily query CLETS, and, second, Schmelter had testified that he checked defendant's status in ways other than electronic database searches. Id. at 34:20–23.

   4. The Court's Prior Order

In his original motion to suppress, defendant argued the physical evidence and statements obtained after the traffic stop must be suppressed as the fruit of a constitutionally defective stop. Dkt. 91, Court's prior order denying motion to suppress ("Ord."), at 10–11. The government argued the officers has reasonable suspicion to stop the vehicle based on (1) the alleged traffic violation observed by Collet, and (2) Schmelter's identification of defendant and his knowledge that defendant was subject to an outstanding warrant. Id. at 11. The Court found that the evidence of the traffic violation "appear[ed] to be mixed," and therefore based its decision on Schmelter's knowledge of defendant and his status. Id.

To this point, defendant argued that Schmelter was not being truthful when he stated that he knew defendant was subject to a warrant before stopping the vehicle. Id. at 12. The Court disagreed, concluding that "[t]he evidence … supports a conclusion that the officers were reasonably certain that Torres was the passenger observed in the Hyundai, and that the officers knew upon making that identification that Torres had an outstanding felony warrant." Id. The Court reasoned:

> Based on his regular review of Torres' records in electronic databases, and communications with other law enforcement officials, Officer Schmelter knew that Torres had an outstanding warrant. [Citation.] … Given Officer Schmelter's identification of Torres and his background knowledge of Torres' outstanding

---

[7] Although the record indicates that iCop simply queries VCCJIS, see Snyder Decl. 2, Exh. 2 (iCop is an "application … [that] pulls data only from VCCJIS"), the records produced by the government include a list of queries run on iCop, not all of which appear on the list of queries run on VCCJIS, see Snyder Decl. 2, Exhs. 7, 8. Accordingly, the parties appear to concede that iCop and VCCJIS are different databases.

warrants [sic], the officers had a reasonable belief to stop the Hyundai to execute the warrant and search Torres subject to that warrant, as well as the search terms of his probation. [Citation.]

Id. Based on the record before the Court, the Court denied defendant's motion to suppress.

    5. Newly-Produced Evidence

After the Court issued its order, defendant requested additional documents from the government related to the electronic databases. In response, the government produced all queries of defendant's records conducted on VCCJIS, CLETS, and iCop. The records show that Schmelter queried about defendant four times in the seven months preceding the arrest: twice on May 2, 2019, once on May 3, 2019, and once on May 23, 2019. Snyder Decl. 2, Exh. 9. Only the May 23, 2019 query occurred in the month preceding the arrest. He did not query about defendant on June 7, 2019, until 7:56 PM, after the traffic stop. Snyder Decl. 2, Exh. 10.

The records also show that law enforcement personnel in Ventura County queried about defendant roughly 70 times in the seven months preceding the arrest (12 queries on VCCJIS, 16 queries on CLETS, and 42 queries on iCop).[8] (The Court is unable, based on the records provided, to determine from which law enforcement organization these queries were made, although defendant contends that "more queries for Torres in the first half of 2019 [came] from the OPD's homelessness unit than from Schmelter's unit[.]" Reply ISO Mot. to Suppress at 2; see dkt. 163, Declaration of Andrew M. Roach, Exh. 5 (OPD organizational chart).) No one in Ventura County, though, queried about defendant on June 7, 2019, prior to the traffic stop. No one in Ventura County queried about defendant on a daily basis in the months preceding the arrest, although defendant was being queried about several times a week.

Finally, the government produced what it contends is the surveillance plan referenced by Schmelter during the suppression hearing. Snyder Decl. 2, Exh. 14. This plan, dated May 2, 2019, provides that OPD officers would conduct "loose surveillance" of a suspect who was not defendant. It also states that, if that suspect met with any of four other suspects, including defendant, the officers should "continue loose surveillance."

---

[8] The Court has omitted repeat queries from this count. Repeat queries are those in which one user is recorded as having queried about defendant within the same minute or several minutes (VCCJIS and CLETS timestamp the queries), or same day (iCop only reports the day of the query). The Court has counted each such group of queries as a single query.

Based on these newly-produced records, defendant moves to suppress the evidence obtained after the traffic stop on the grounds that the traffic stop was an unlawful seizure under the Fourth Amendment.

### B. Legal Standard

The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness,'" Brigham City, Utah v. Stuart, 547 U.S. 398, 403 (2006), and "reasonableness generally requires the obtaining of a judicial warrant," Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 653 (1995). "Because warrantless searches and seizures are per se unreasonable, the government bears the burden of showing that a warrantless search or seizure falls within an exception to the Fourth Amendment's warrant requirement." United States v. Cervantes, 703 F.3d 1135, 1141 (9th Cir. 2012).

A traffic stop by local law enforcement constitutes a warrantless Fourth Amendment "seizure of the occupants of the vehicle." Heien v. North Carolina, 574 U.S. 54, 60 (2014) (quotation omitted). "[T]he Fourth Amendment requires only reasonable suspicion in the context of investigatory traffic stops." See United States v. Lopez-Soto, 205 F.3d 1101, 1104–05 (9th Cir. 2000) (rejecting defendant's contention that stricter probable cause standard applied); accord United States v. Choudhry, 461 F.3d 1097, 1100 (9th Cir. 2006) (holding that "traffic stops are akin to the on-the-street encounters addressed in Terry v. Ohio, 392 U.S. 1 (1968)," and that "the same objective standard applies: a police officer may conduct an investigatory traffic stop if the officer has 'reasonable suspicion' that a particular person 'has committed, is committing, or is about to commit a crime'") (citation omitted). Reasonable suspicion must be based on "specific articulable facts which, together with objective reasonable inferences, form the basis for suspecting the particular person detained is engaged in criminal activity." United States v. Job, 871 F.3d 852, 861 (9th Cir. 2017) (quotation omitted). "[O]nly the facts known to [law enforcement] before they turned on their red signal lights may be considered by the court in determining whether founded suspicion existed." United States v. Doe, 701 F.2d 819, 821 (9th Cir. 1983). In other words, law enforcement "cannot retroactively justify" a traffic stop "on the basis of" information discovered "after-the-fact." Moreno v. Baca, 431 F.3d 633, 641 (9th Cir. 2005). Finally, "[o]fficers may stop a vehicle in which they reasonably believe the subject of a warrant is traveling to execute the warrant." United States v. Savath, 398 F. App'x 237, 239 (9th Cir. 2010) (citing United States v. O'Connor, 658 F.2d 688, 691 (9th Cir. 1981)).

"Searches and seizures that offend the Fourth Amendment are unlawful and evidence obtained as a direct or indirect result of such invasions is considered 'fruit of the poisonous tree' and is inadmissible under the exclusionary rule." United States v. McClendon, 713 F.3d 1211,

1215 (9th Cir. 2013). Accordingly, a defendant challenging the admissibility of evidence on the basis of an unlawful search may bring a motion to suppress the evidence. See United States v. Feil, No. 09-cr-00863-JSW-BZ, 2010 WL 11205823, at *1 (N.D. Cal. Sept. 29, 2010) (citing Wong Sun v. United States, 371 U.S. 471, 488 (1963)).

## C. Discussion

As noted above, the Court denied defendant's previous motion to suppress, finding that Schmelter and Collet justifiably stopped the Hyundai upon Schmelter's recognition of defendant, and belief that defendant was subject to a warrant and search terms. It appears that defendant now concedes that Schmelter recognized defendant, and, in any event, the Court finds persuasive the fact that it was the officers who first used defendant's name despite his having provided a false name. At issue in defendant's instant motion is whether Schmelter in fact knew that defendant was subject to a warrant when he and Collet effectuated the traffic stop.

In support of his current motion, defendant first argues that reconsideration of the Court's order denying his motion to suppress is appropriate given that the new evidence produced by the government reveals Schmelter "lied about the few key facts to which he actually committed, which were central to his supposed contemporaneous knowledge of Torres's warrant." Mot. to Suppress at 21. In the alternative, defendant argues that the Court should suppress the fruits of the traffic stop because the new evidence undermines Schmelter's testimony that he knew defendant had a warrant at the time of the traffic stop. Specifically, defendant argues that "Schmelter's claims about checking Torres's warrant on a daily basis, including on the day of the arrest, were critical," and that, "[n]ow that they have been shown to be untrue, the entire premise for concluding that he knew about the warrant on June 7 falls apart." Id. at 22. Furthermore, defendant argues that "Schmelter's credibility was of paramount importance" because he was unable to substantiate any of his claims with firm evidence. Id. at 22–23. At the May 17, 2021 hearing, defendant emphasized that the government has failed to provide any third-party testimony corroborating Schmelter's claim that he checked defendant's status by speaking to other officers, which, considering the newly-produced database records, is the only way Schmelter could have checked the warrant leading up to the stop. Defendant acknowledged, however, that the Fourth Amendment does not require third-party corroboration.

The government responds that defendant misinterprets Schmelter's testimony. According to the government, Schmelter never testified that he conducted an electronic search for defendant's information on June 7, 2019, but rather only that he remembered "checking" defendant's status that day. Opp. to Mot. to Suppress at 5. Schmelter listed several means by which he might "check" defendant's status. Likewise, the fact that he did not query the databases daily does not contradict Schmelter's testimony that he "check[ed] upon the defendant's status daily."

Schmelter has testified that he knew defendant was subject to a warrant when he stopped the Hyundai, which is sufficient to justify the stop so long as the Court finds this testimony credible. While the newly-produced evidence reveals that Schmelter did not query VCCJIS, CLETS or iCop for defendant's information daily preceding the stop nor before the stop the day of, the argument ignores the fact that Schmelter testified that he also relied on other means of checking defendant's warrant, including statements by other officers.

Furthermore, although Schmelter's testimony fails to establish precisely the time and place at which he learned that defendant was subject to a warrant, he has provided a list of ways in which he may have learned of the warrant, and the record supports his testimony that he knew defendant was subject to a warrant. First of all, Schmelter or Collet knew who defendant was, as evidenced by their response to defendant's having provided the false name. Furthermore, defendant's name was referenced in a surveillance operation, dated May 2, 2019, of which Schmelter was aware, and Schmelter queried iCop for defendant's information twice on the evening of May 2, 2019, and once the following day. At this point, Schmelter would have seen that defendant was subject to a warrant. Schmelter would have confirmed defendant was still subject to a warrant when he queried iCop for defendant's records some weeks later, on May 23, 2019. This was only two weeks before the traffic stop. This suffices to corroborate Schmelter's testimony that he knew defendant was subject to a warrant.[9]

Accordingly, the Court **DENIES** defendant's motion to suppress.

## IV.   MOTION IN LIMINE

Defendant moves *in limine* to exclude testimony from the government's narcotics expert.

---

[9] Defendant challenges the degree of certainty Schmelter must have had that there was an outstanding warrant for defendant's arrest. Specifically, defendant argues that Schmelter must have had contemporaneously verified, actual knowledge that a warrant was outstanding. Mot. to Suppress at 21–22. The government responds that Schmelter only needed to have reasonable suspicion that defendant was subject to a warrant. Opp. to Mot. to Suppress at 14. This dispute is beside the point, though, because Schmelter testified that he did know defendant was subject to a warrant. The question before the Court, then, is whether Schmelter's testimony is credible, as discussed above. In any event, defendant cites to no authority for the proposition that an officer must verify the existence of a warrant in the moments before effectuating a traffic stop pursuant to that warrant.

## A. Background

To prove defendant intended to sell the 45.73 grams of methamphetamine he possessed, the government seeks to introduce testimony from a narcotics expert. Initially, the government disclosed that it would call OPD Detective Andrew Pinkstaff to testify:

1) That the use of intermediaries and middlemen is a common practice of drug suppliers;

2) About methamphetamine's physical attributes, common packaging methods, wholesale and retail prices, personal dosage amounts (versus distribution amounts), typical import, transport, and distribution methods;

3) That the quantity of methamphetamine, the drug scales, pipes, plastic bags, and other related items recovered from defendant are indicative of drug distribution;

4) That 45.73 grams of methamphetamine constitutes approximately 180 to 450 individual doses for a typical user;

5) That 45.73 grams of methamphetamine has a bulk value of $500 to 600, and a potential resale value of $1,000 when sold into standard dosage sizes;

6) That defendant intended to distribute at least 5 grams of the approximately 45.73 grams of methamphetamine recovered; and

7) That the words "stuff" and "makeup" were coded terms for drugs.

Dkt. 151, Declaration of Jennifer J. Uyeda ("Uyeda Decl."), Exh. A at 24–25. The government notified defendant of Pinkstaff's proposed testimony on April 29, 2021.

Defendant initially objected to this testimony on the grounds that (1) Pinkstaff's testimony was based on experience, not reliable principles and methods, see Fed. R. Evid. 702; (2) Pinkstaff was unqualified to testify to the meaning of certain alleged code words; (3) Pinkstaff's testimony relied on hearsay, see Fed. R. Evid. 703; (4) Pinkstaff's testimony violated the Confrontation Clause; (5) Pinkstaff intended to testify to defendant's mental state, see Fed. R. Evid. 704(b); (6) Pinkstaff's testimony would be unduly prejudicial, see Fed. R. Evid. 403; and (7) the government provided insufficient notice of the testimony, see Fed. R. Crim. P. 16. The government's opposition was directed at these arguments.

However, before the Court could hold a hearing, the government notified defendant and the Court that it intended to call a different narcotics expert in Pinkstaff's place, Los Angeles Police Department ("LAPD") Detective Humberto G. Irigoyen. Supp. Opp. to MIL at 2. According to the government's May 7, 2021 notice, Irigoyen will testify:

1) About methamphetamine's physical attributes, common packaging methods, wholesale and retail prices, personal dosage amounts, and distribution methods;

2) That items such as pipes, plastic bags, heroin and marijuana are indicative of narcotics distribution;

3) That the methamphetamine in defendant's possession constituted approximately 180 to 450 individual doses for a typical user;

4) That the methamphetamine in defendant's possession had a bulk value of approximately $400 to $600, and a current resale value of approximately $800 to $1,000; and

5) That drug traffickers often use code words and avoid directly referencing quantities or prices when discussing narcotics, especially when in custody.

Id. at 4–5.

In his supplement to his motion *in limine*, defendant objected to Irigoyen's testimony on the grounds that (1) the notice was insufficient, and (2) Irigoyen is unqualified. See Supp. to MIL.

The Court will address defendant's objections to Irigoyen's testimony, as well as his objections to Pinkstaff's testimony to the extent those arguments remain applicable. Likewise, because the government's opposition was directed at Pinkstaff's testimony, the Court will apply those arguments to the discussion regarding Irigoyen's testimony, to the extent applicable.

## B. Legal Standard

"A motion *in limine* is a procedural mechanism to limit in advance testimony or evidence in a particular area." United States v. Heller, 551 F.3d 1108, 1111 (9th Cir. 2009). "[M]otions *in limine* must identify the evidence at issue and state with specificity why such evidence is inadmissible." Colton Crane Co., LLC v. Terex Cranes Wilmington, Inc., No. 08-cv-08525-PSG (PJWx), 2010 WL 2035800, at *1 (C.D. Cal. May 19, 2010). The "failure to specify the evidence" that a motion *in limine* "seek[s] to exclude constitutes a sufficient basis upon which to deny th[e] motion." Bullard v. Wastequip Mfg. Co. LLC, No. 14-cv-01309-MMM, 2015 WL 13757143, at *7 (C.D. Cal. May 4, 2015).

"Trial courts have broad discretion when ruling on motions *in limine*." Matrix Int'l Textile, Inc. v. Monopoly Textile, Inc., No. 2:16-cv-0084-FMO-AJW, 2017 WL 2929377, at *1 (C.D. Cal. May 14, 2017). Such rulings are "not binding on the trial judge, and the judge may always change his mind during the course of a trial." Ohler v. United States, 529 U.S. 753, 758 (2000). "Denial of a motion *in limine* does not necessarily mean that all evidence contemplated by the motion will be admitted at trial. Denial merely means that without the context of trial, the court

is unable to determine whether the evidence in question should be excluded." <u>Matrix Int'l Textile</u>, 2017 WL 2929377, at *1 (citation omitted).

### C. Discussion

    1. <u>Sufficiency of Notice (Federal Rule of Criminal Procedure 16)</u>

      Trial is set for June 10, 2021.  With regard to the government's April 29, 2021 notice of Pinkstaff's testimony, defendant argued the notice was insufficient because the descriptions of his anticipated testimony were too vague to inform cross-examination, and because the notice was provided too late, especially considering the length of time this case has been pending.  MIL at 14.  As to Irigoyen, defendant argues that he has insufficient time to test the merits of Irigoyen's testimony because the only way to do so is by comparing his testimony in previous cases to ensure consistency.  Supp. to MIL at 4–5.  Not only is the amount of time insufficient, but the government apparently has not provided a list of cases in which Irigoyen has testified.  <u>Id.</u> at 3, 5.  Defendant emphasized this argument at the May 17, 2021 hearing.  The government responds that, given the relatively routine and straight-forward nature of its expert's anticipated testimony, the month separating the disclosure and the trial is sufficient time to prepare a cross examination.  Opp. to MIL at 14.  Furthermore, the government argues that the notice was sufficiently specific in that it summarized the anticipated testimony.  <u>Id.</u>  At the hearing, the government maintained that it had no obligation to provide a list of cases in which Irigoyen has testified.

      Federal Rule of Criminal Procedure 16 ("Rule 16") provides that "the government must give to the defendant a written summary of any testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence during its case-in-chief at trial," and that the summary "must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications."  Fed. R. Crim. P. 16(a)(1)(G).  In evaluating the sufficiency of notice pursuant to Rule 16, courts ask whether the notice provided the defendant "with a fair opportunity to test the merit of the expert's testimony through focused cross-examination."  <u>United States v. Mendoza-Paz</u>, 286 F.3d 1104, 1111 (9th Cir. 2002) (quoting Fed. R. Crim. P. 16, 1993 amend. advisory committee's note).

      Here, defendant will have had a month between receiving notice of Irigoyen's anticipated testimony and the trial date; in fact, because Irigoyen's anticipated testimony is effectively identical to Pinkstaff's, defendant was aware of the line of questioning for closer to six weeks.  Considering the straight-forward and routine nature of Irigoyen's testimony, this amount of time is sufficient to prepare cross-examination.  <u>See</u> <u>Mendoza-Paz</u>, 286 F.3d at 1111 (upholding notice of narcotics valuation expert provided 12 days before trial).  For these same reasons, the summary of the anticipated testimony provided in the notice is sufficiently specific.  <u>See</u> <u>id.</u> (summary of testimony sufficient).

Furthermore, the Court cannot identify—and defendant fails to cite—any authority supporting defendant's argument that a list of cases in which an expert witness has testified is required under Rule 16.  See United States v. Lopez, No. 2:16-cr-00265-GMN (CWH), 2019 WL 2393610, at *4 (D. Nev. June 6, 2019) (denying defendant's request for government to produce "additional expert information [including] transcripts of all prior testimony" because defendant "provide[d] no points and authorities to justify these requests").  Nevertheless, at the May 17, 2021 hearing, the Court directed the government to produce a list of the ascertainable cases in which Irigoyen has testified in the last five years at the soonest time practicable.  Accordingly, with this direction to the government, the Court **DENIES** defendant's motion to the extent it is based on insufficiency of notice.

    2.  Qualifications (Rule 702)

Defendant initially argued that Pinkstaff's testimony would not have been not the product of reliable principles and methodology, but rather was based only on his experience.  MIL at 3.  With regard to Irigoyen's anticipated testimony, defendant argues the same.  Supp. to MIL at 7.  In response to defendant's objection to Pinkstaff's qualifications, the government argued that the average juror does not know about standard doses or prices of methamphetamine, nor about common practices of drug distributors, and that Pinkstaff's testimony would have provided jurors with this knowledge.  Opp. to MIL at 7.  The government added that numerous cases from the Ninth Circuit have upheld admission of similar testimony.  Id.

Under Federal Rule of Evidence 702 ("Rule 702"), a trial judge acts as a "gatekeeper" to ensure that expert testimony "is not only relevant, but reliable."  Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589 (1993) ("Daubert").  A trial judge executes this "gatekeeper" role regardless of whether expert testimony is scientific or non-scientific, with the purpose of ensuring that "an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  Kumho Tire Co., v. Carmichael, 526 U.S. 137, 152 (1999).  "[I]n considering the admissibility of testimony based on some 'other specialized knowledge,' Rule 702 generally is construed liberally."  United States v. Hankey, 203 F.3d 1160, 1168 (9th Cir. 2000).  Finally, Rule 702 expressly contemplates the expert testimony of qualified law enforcement officers.  The Advisory Committee notes to Rule 702 explain that "the method used by the agent is the application of extensive experience …, [and s]o long as the principles and methods are reliable and applied reliably to the facts of the case, this type of testimony should be admitted."  Fed. R. Evid. 702, 2002 amend. advisory committee's note.

Here, Irigoyen's testimony is based on his experience in narcotics investigations, and his review of the evidence in this case.  Supp. Opp. to MIL at 5.  Irigoyen has been employed by the LAPD for 21 years, the last 17 of which as a narcotics investigator.  Id. at 3.  The fact that

Irigoyen's expertise is based on his experience does not prohibit his testimony under Rule 702. See Kumho, 526 U.S. at 152. Rather, the Court makes a preliminary finding that Irigoyen's anticipated testimony will be reliable, subject to the presentation of Irigoyen's qualifications and experience at trial. Accordingly, the Court **DENIES** defendant's motion to the extent it is based on Irigoyen's qualifications.[10]

### 3. Qualifications Regarding Code Words

In his motion *in limine*, defendant further argued that Pinkstaff was not qualified to testify, at the very least, as to the meaning of "stuff" and "makeup," which apparently were words used by defendant on a recorded jail telephone call. MIL at 13. According to defendant, the only substantiation the government had provided with regard to Pinkstaff's qualifications was his curriculum vitae, which did not suggest he had extensive experience in interpreting coded telephone communications. Id. The government responded that Pinkstaff's qualifications included years of experience investigating the trafficking and distribution of narcotics, and that it would elicit Pinkstaff's qualifications at trial. Opp. to MIL at 16. Irigoyen's proposed testimony does not reference "stuff" or "makeup," but it does address the use of code words in general. Supp. Opp. to MIL at 5. The Court therefore addresses defendant's arguments in anticipation of this dispute arising at trial.

As an initial matter, the Court finds that Irigoyen's experience qualifies him to testify generally that those involved in drug trafficking often use code words. See United States v. Cordoba, 104 F.3d 225, 229–30 (9th Cir. 1997) (expert testimony regarding modus operandi of drug traffickers properly admitted).

Turning to the specific words "stuff" and "makeup," "[t]o interpret the meaning of coded language encountered for the first time in the specific investigation at issue, … Rule 702 requires district courts to assure that an expert's methods for interpreting the new terminology are both reliable and adequately explained." United States v. Vera, 770 F.3d 1232, 1241 (9th Cir. 2014)

---

[10] Defendant further argues that the recent substitution of Irigoyen for Pinkstaff reveals that Irigoyen's testimony cannot be based on expertise because, according to defendant, Irigoyen formed his opinions within 48 hours of having been presented with the case materials. Supp. to MIL at 7. Further, defendant argues it is unlikely two experts would arrive at "identical" opinions when their opinions are based on training and experience. Id. But this argument fails to acknowledge the character of the evidence proposed. All of Irigoyen's expert opinions would have been formed before learning of this case. His application of those opinions to the facts of this case requires no more time than it would have taken him to learn the facts of this case.

(citing <u>United States v. Hermanek</u>, 289 F.3d 1076, 1093 (9th Cir. 2002)).  To the extent the government intends to introduce such evidence, the Court will reserve judgment on the admissibility of this evidence until such time as Irigoyen establishes his methodology for interpreting the disputed words.  <u>See</u> <u>United States v. Decoud</u>, 456 F.3d 996, 1013 (9th Cir. 2006) (upholding admission of expert testimony that certain words were code for narcotics where the "expert explained the methodology that he used to interpret each of the handful of disputed words," which involved "(1) his training and experience; (2) each word in the context of the specific phone call; and (3) each phone call in the context of other phone calls that he understood").  Accordingly, the Court **DENIES** defendant's motion to the extent it seeks to exclude expert testimony that drug traffickers often use codes, but **reserves judgment** on the motion to the extent it seeks to exclude testimony as to the meaning of specific words.

### 4. Reliance on Hearsay (Rule 703)

Defendant further argued that much of Pinkstaff's proposed testimony was based on hearsay, and that without discovery and examination of Pinkstaff, it would have been impossible to determine whether his opinions conform with Federal Rule of Evidence 703 ("Rule 703").  MIL at 7.  The government responded that law enforcement personnel may base their opinions on hearsay so long as that information is the type normally obtained in day-to-day police activity.  Opp. to MIL at 10–11.  The Court applies these arguments to Irigoyen's testimony, which is formed on the same general bases as was Pinkstaff's.

Under Rule 703, an "expert witness may offer opinions based on such inadmissible testimonial hearsay, as well as any other form of inadmissible evidence, if 'experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject.'"  <u>Vera</u>, 770 F.3d at 1237 (discussing Rule 703).  Here, the fact that Irigoyen's opinions may be informed by hearsay evidence is likewise not prohibited under Rule 703.  Defendant will have an opportunity to inquire into the bases of Irigoyen's opinions during cross examination.  Accordingly, the Court **DENIES** defendant's motion to the extent it is based on Irigoyen's reliance on hearsay.

### 5. Confrontation Clause

Defendant further argued he "has a Sixth Amendment right to confront in open court whoever told Pinkstaff the cost and resale value for methamphetamine, the amount of an individual dose for a normal methamphetamine user, the common packaging methods, personal dosage amounts, and the typical import, transport, and distribution methods."  MIL at 8.  The government responded that defendant mischaracterized Pinkstaff's anticipated testimony: it is not that he would have reiterated hearsay; rather, he would have relied upon his experiences, which

**CRIMINAL MINUTES – GENERAL**            **'O'**

included street intelligence, to offer expert opinions.  Opp. to MIL at 10.  The Court applies these arguments to Irigoyen's proposed testimony because it is susceptible to the same challenge.

Under Crawford v. Washington, 541 U.S. 36 (2004), a defendant's Confrontation Clause rights are violated by the admission of "testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had … a prior opportunity for cross-examination."  Id. at 53–54.  Accordingly, "there is generally no Crawford problem when an expert 'appli[es] his training and experience to the sources before him and reach[es] an independent judgment.'"  Vera, 770 F.3d at 1237 (quoting United States v. Gomez, 725 F.3d 1121, 1129 (9th Cir. 2013)) (alterations in original).  "But an expert exceeds the bounds of permissible expert testimony and violates a defendant's Confrontation Clause rights when he 'is used as little more than a conduit or transmitter for testimonial hearsay, rather than as a true expert whose considered opinion sheds light on some specialized factual situation.'"  Id. (quoting Gomez, 725 F.3d at 1129).

So long as Irigoyen offers his independent judgment, even if based on information provided by persons not testifying in court, defendant's Confrontation Clause rights are not violated.  Accordingly, the Court **DENIES** defendant's motion to the extent it is based on his Confrontation Clause rights.

6.  Mental State (Rule 704(b))

Defendant also argued that Pinkstaff's anticipated testimony about the quantity of methamphetamine in a typical personal dose and quantities indicative of distribution contravened Federal Rule of Evidence 704(b) ("Rule 704(b)").  MIL at 8–9.  The government responded that Pinkstaff would not opine on defendant's state of mind, but rather that the quantity of methamphetamine and the other items found in defendant's possession are indicative of and consistent with narcotics distribution.  Opp. to MIL at 8.  The government contended the Ninth Circuit has consistently held that a narcotics expert may answer hypothetical questions regarding intent to distribute.  Id.  Because Irigoyen anticipates providing the same testimony, the Court applies the parties' arguments to Irigoyen's testimony.

Rule 704(b) prohibits an expert in a criminal case from "stat[ing] an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense."  Fed. R. Evid. 704(b).

Irigoyen's anticipated testimony as to typical personal doses and quantities indicative of distribution does not violate Rule 704(b).  See United States v. Gonzales, 307 F.3d 906, 911 (9th Cir. 2002) (upholding admission of officer testimony as to "whether the particular amount of drugs found on a person indicated whether such an individual possessed the drugs for personal

use or for distribution"). Accordingly, the Court **DENIES** defendant's motion to exclude Irigoyen's testimony regarding methamphetamine quantities on this ground.[11]

     7. Unfair Prejudice (Rule 403)

     Defendant initially argued that it would have been unduly prejudicial and irrelevant for Pinkstaff to testify that the use of intermediaries and middlemen is a common practice among drug suppliers. MIL at 11. Specifically, this testimony "improperly implie[d] that Mr. Torres (1) was involved in an organization as a middleman, and (2) impute[d] that he had the intent to sell the drugs in his possession as his role as a middleman." Id. at 12. The government responded that the probative value of this evidence outweighed its prejudicial effect. Opp. to MIL at 11. However, the government also stated that it "d[id] not intend to elicit expert testimony on drug organizations or the use of middlemen to sell drugs." Id. at 12. Irigoyen's anticipated testimony references "distribution methods," but does not reference intermediaries or middlemen. The parties' dispute may therefore be moot. Nevertheless, the Court addresses it in the event Irigoyen seeks to testify to the role of intermediaries or middlemen.

     In some circumstances, the Ninth Circuit has held law enforcement officers may offer expert opinion testimony as to the common practices of drug dealers. See, e.g., United States v. Espinosa, 827 F.2d 604, 612 (9th Cir. 1987) ("In a series of cases, we have upheld admission of a law enforcement officer's expert testimony that the defendant's activities indicated that he acted in accordance with usual criminal modus operandi." (collecting drug trafficking cases)).

     However, in United States v. Vallejo, 237 F.3d 1008 (9th Cir.), opinion amended on denial of reh'g, 246 F.3d 1150 (9th Cir. 2001), the Ninth Circuit held "that expert testimony regarding the general structure and operations of drug trafficking organizations is inadmissible where the defendant is not charged with a conspiracy to import drugs or where such evidence is not otherwise probative of a matter properly before the court." Id. at 1012; see United States v. McGowan, 274 F.3d 1251 (9th Cir. 2001) (same). The Ninth Circuit has since clarified, however, that "[n]either Vallejo nor its progeny supports the establishment of a per se rule that expert testimony regarding the operation and structure of drug trafficking organizations or the modus operandi of couriers involved in drug trafficking organizations is inadmissible." United States v. Sepulveda-Barraza, 645 F.3d 1066, 1070 (9th Cir. 2011). Rather, courts "must independently

--------

[11] Pinkstaff's proposed testimony included his opinion that defendant "intended to distribute at least 5 grams of the … methamphetamine" in his possession. Uyeda Decl., Exh. A at 25. Irigoyen does not anticipate providing this opinion. In any event, such an opinion would contravene Rule 704(b) because defendant's intent is a question of fact left to the jury.

determine whether the expert testimony is relevant and probative on a case-by-case basis." Id. at 1071.

Here, defendant is not charged with conspiracy to import drugs. In addition, the Court cannot conclude, at this time, that testimony on the use of intermediaries and middlemen in drug-trafficking organizations is "otherwise probative of a matter properly before the court." Vallejo, 237 F.3d at 1012. As a result, the Court **GRANTS** defendant's motion to exclude testimony on the use of intermediaries and middlemen, subject to reconsideration if the government demonstrates that such testimony relates to defendant in particular.

    8. Daubert Hearing

Defendant requests that the Court conduct an evidentiary hearing pursuant to Daubert if it does not grant his motion *in limine*. MIL at 2, 7, 15. However, based on its preliminary conclusion that Irigoyen is qualified as a narcotics expert, discussed above, the Court finds that a Daubert hearing is unnecessary. See United States v. Alatorre, 222 F.3d 1098, 1105 (9th Cir. 2000) (concluding that pretrial hearing was not required before admission of officer's testimony about, inter alia, value of marijuana, and distributable quantity). In any event, defendant will have "an opportunity … at trial … to explore the relevance and reliability of the proposed testimony[.]" Id.

## V.   CONCLUSION

In accordance with the foregoing, the Court:

1) **DENIES** defendant's motion to dismiss;

2) **DENIES** defendant's motion to suppress; and

3) **GRANTS in part**, **DENIES in part**, and **reserves judgment** on defendant's motion *in limine*.

IT IS SO ORDERED.

|  | 00 | : | 00 |
|---|---|---|---|
| Initials of Deputy Clerk | | CMJ | |